Case number 251001, Robert Boyd v. Northern Biomedical Research et al. Argument not to exceed 15 minutes per side. Mr. Nelson, you may proceed for the appellant. Good morning, Your Honors. Matthew Nelson on behalf of Dr. Robert Boyd, the plaintiff I'd like to reserve three minutes for rebuttal. Fine. May it please the court, Dr. Boyd sold his 16% interest in Northern Biomedical, a business he founded, without knowing anything about the defendant's months-long pursuit of venture capital, which had culminated days before the closing on his stock buyback, in a conversation with Avista Capital where Avista indicated that they believed that the company could be worth, or was worth, at least three times more than the valuation that had been used to set the purchase price for Dr. Boyd's stock. Even though Dr. Boyd was a director and chairman of the board for the company, and even though he was a shareholder in a minority, or in a closely held corporation, the defendants kept this information from him. Dr. Boyd has testified that had he known the information, he would have reanalyzed the decision as to whether or not to sell his stock. The district court erred here by concluding that the defendants did not have a duty to disclose this information to Dr. Boyd before the stock buyback closed. The most critical error by the district court, in our opinion, is the district court's application of the Delaware materiality standard for breach of fiduciary duty claims under Michigan law. Michigan has adopted a may-might-affect as shareholder action standard for materiality, especially with regard to breach of duty of candor claims, and we find that recited in Murphy v. Inman from the Michigan Supreme Court in 2022, but stated in Reed v. Pitkin, a Michigan Supreme Court decision from 1925. Now defendants say that in Murphy, the Michigan Supreme Court misinterpreted the Reed decision, and that the Reed decision is only about the duties of the defendant there as an agent and trustee. And in preparing for argument today, I went back and re-read Murphy v. Inman, and it quotes from the court's, the Michigan Supreme Court's earlier decision in Thomas v. Saffield County, 108 Northwest 2nd, 907, 1961, for the proposition that the duties owed by a director to shareholders under Michigan law is that of an agent or trustee. So although we said in our brief that this court might need to make an eerie guess depending on how it treated the Murphy decision, it is now our position that Reed v. Pitkin establishes what Michigan law is. There's no need for an eerie guess. The Michigan Supreme Court has spoken in Reed v. Pitkin and reaffirmed that conclusion in Murphy v. Inman. That already low threshold for materiality is reduced even further because of the context here of the corporation being a closely, excuse me, a closely held corporation. In that context, the duties that are owed are more partnership-like, which is an even more expansive duty of being required to share all information that is held by a director with the other directors or the other partners that is relevant to the business. The district court instead applied the federal and Delaware standard from TSC Industries even though through the vehicle of the Rosenblatt decision from Delaware, even though the TSC Industries case from the U.S. Supreme Court explicitly rejected the standard that Michigan has adopted in favor of the total mix standard that's applicable in the federal securities context. There was no basis for the district court to do so. We believe that the court erred on this fundamental issue of the law. Applying that lower standard, there's no argument as far as I can tell from my brother that the information that was not disclosed was not material under Michigan's materiality standard. And what exactly is the information that was not disclosed? The information that was not disclosed is the overall pursuit of the venture capital, which we've identified as three particular omitted facts. In reverse chronological order, you have the conversation on December 18 with Avista, where Avista posits an implied valuation of Northern Biomedical of $60 to $70 million. That information obviously might have affected a shareholder where their stock buyback was based on a valuation of the company of only $21 million. Is there a problem that the transfer of the shares by your client occurred on the day before, on December 17 instead of 18? So on December 17, he signs the stock buyback agreement. He doesn't communicate the stock buyback agreement to the other side until the 21st. Until there's an actual delivery of the acceptance of the contract, if it's acceptance or the offer, because the other side hadn't signed it, my client is not bound by it. So during that period of time, he remained a shareholder. They continued to owe him fiduciary duties. Well, didn't the agreement itself say, though, that it was effective as of December 17? Does that not matter because it wasn't delivered until a few days later? Is that what you're saying? For the purposes of what fiduciary duties were owed to Dr. Boyd and when, yes. Our position is that it doesn't matter that the document was backdated. The fact that it was backdated is irrelevant because during this period of time, he remained, in fact, a shareholder until it was communicated. After the transaction closed, he was no longer a shareholder. If that's not, but even if the court were to say, we're going to conclude that even though the defendants weren't aware of the fact that he wasn't a shareholder anymore, their duties to him had been terminated because of his undisclosed signature on the contract. That would then result in our fraud claim taking greater precedence because it would then be an issue of fraudulent inducement. He hadn't communicated the document yet, and until that point, they owed him that information. Were there any other things? You started out with saying there were several pieces of evidence, one being the December 18th. Were there things before the 17th that would prove your situation under Michigan law? Yes, Your Honor. We believe that the entire pursuit of an equity investment here, the totality of the circumstances of that pursuit, would support our position. The second omitted fact that we pointed to in our briefs was the fact that they had been affirmatively contacted by Avista at the end of November with regard to the fact that Avista had an interest in purchasing a portion of the company. All the parties here knew Avista. They knew its track record. They knew what it had done with regard to an earlier transaction with a similar company. They knew that it was looking for three times the amount, and the defendants knew from earlier conversations that Avista wouldn't be interested in their company unless it was worth at least $50 million, which is more than double the valuation value that was used here. They then went to a board meeting on December 4th to talk about the future prospects of the company. The minutes indicate that facility expansion, excuse me, the notes from Ms. Zeller, who was another director, indicate that facility expansion was addressed, and there was no discussion with regard to the future business prospects of the firm of this very significant issue that they were pursuing venture capital and had these conversations, in fact, later that week with Avista. Under that partnership-like standard, we believe that a reasonable juror could conclude that our client was entitled to that information and it might have affected his decision. But then going back... So there was some meeting between your client and someone named Han in Idaho that apparently there's a question whether the idea of venture capital was discussed then. Can you address that issue? That was going to be the last point that I was going to address then. So with regard to that conversation, the district court concluded that Mr. Han must have referenced this because there was a discussion about venture capital generally. From the transcript, right in the light most favorable to my client, we do not believe that that is a reasonable inference. In fact, the reasonable inference is that there was a discussion of the fact that my client Dr. Boyd had disdain for venture capital, something that he had expressed on other occasions as well, but not with regard to the fact that Mr. Han was in fact pursuing venture capital at that time. In fact, what the record shows is that in September, on September 14, Mr. Han is actually saying, I'm just diving into venture capital. The other defendants testify that they became interested in venture capital and in capital investment in late summer 2020 or early autumn 2020. June is neither late summer nor early autumn. Mr. Han, it's reasonable to infer, could not have been disclosing something he was not doing when he was talking about what he was pursuing with regard to financing. In fact, what is absolutely clear from the record is that he told Dr. Boyd that they were pursuing debt financing through Mercantile Bank for the purposes of facility expansion. I don't believe we have a ruling from the district court on whether or not, if there was nondisclosure here, I think the district court just ruled that it was disclosed and that was the end of the analysis under the federal securities claim. We haven't gotten a ruling from the district court yet as to whether or not, if there was nondisclosure, whether that rises to the level of materiality under the federal standard. Is that fair to say? I think that's fair to say, although I think that the district court's decision is, in my opinion, a little bit, it seems to mesh the question of whether there was an omission and whether the purported omission was material together. We believe that... I think it's right for us to go ahead and address, if we find there's a disputed issue here, whether or not this would be materialized under the federal standard. I'll start with the state standard. We absolutely believe that's the case with regard to the state standard. With regard to the federal standard, yes, we also believe it would be appropriate to address materiality and whether, as a matter of law, the court can address that issue. Materiality is, generally speaking, a very factual inquiry. Why do you meet the federal standard of materiality? Why do we meet the federal standard? That if you take all of this information together, it's not the fact of the particular deal that's  It's the fact that the defendants were actively pursuing an equity investment. After having left my client with the impression that they were pursuing debt financing only. Debt financing is going to have a detrimental short-term effect on the value of the business. That would suggest get out now. Equity financing, on the other hand, has the potential of a very significant upside as it had here. That's a distinction that a reasonable shareholder is going to be interested in. I see I have a very short period. There's one point I want to make. There's a clarification I want to make with regard to our federal securities claim. In preparation for the argument today, we ran across the Macquarie Infrastructure case from the United States Supreme Court. Macquarie Infrastructure v. Moab Partners, 601 U.S. 257. In that case, the Supreme Court has said that pure omissions are not actionable under Rule 10b-5. It's not a case that either party has cited, but in reading it, we realize that we criticize the district court for not adopting a pure omission standard at certain points in Argument 2a of our opening brief. We want to withdraw those criticisms. Based on the Macquarie decision, they're not well-founded. We do believe the omissions here... Say the name of the case again. Macquarie, M-A-C-Q-U-A-R-I-E. What is your argument then if you don't have a pure omission argument anymore? What are you arguing now under the federal... That the factual record here demonstrates that the statements that were made were rendered misleading by the fact that they omitted other statements. So this is not a pure omissions case. That's how the district court... What are the particular statements that were made that you're contending? That would be the statements with regard to the debt financing in June of 2020, and then also the shareholder meeting in December of 2020, December 4, I believe, of 2020, where there's a discussion of the financial plans and the future business pursuits of the company and facilities expansion, and they don't reference this fact. Thank you. Thank you. Thank you. Good morning, your honors. Good morning. May it please the court, Greg Timmer here on behalf of the appellees. I also have a case to bring to the court's attention, but unfortunately it was decided in 2019. It's a Michigan Court of Appeals case. It's Nicole, N-I-C-H-O-L-L, v. Torgow, T-O-R-G-O-W, and the citation is 950 Northwest 2nd, 535. The case is brought to the court's attention simply to note that in a breach of fiduciary case, the Court of Appeals applied the Delaware standard, the Rosenblatt standard, to determine materiality. That's the Michigan Court of Appeals, and your opponent was talking about two Michigan Supreme Court cases. How does this Michigan case from the Court of Appeals impact those more higher court cases? Well, if you adopt his interpretation of the case and carry it to its logical conclusion, it's a vast transformation of Michigan law because, as he says in his appellee's brief, this leads to partnership standards in close corporations. And he goes ahead and briefs for the court how this case should be resolved if they were partners. What is wrong intellectually with that argument that close corporations in Michigan should be treated as partnerships for this purpose at least? He's not cited case law that holds that. That comes from the Estes decision where it was a special panel convened to resolve a conflict in the Court of Appeals, and during the course of the analysis of the statute, the Estes panel relied on two treaties for the proposition. He clarified it in his reply brief that some courts have treated close corporations or applied duties akin to partnership duties. And the way I've not had the opportunity to look at those sites, I look for them, but it seems to me that that is an academic commentator's observation, which undoubtedly is true. These are fiduciary duties are context specific. The Murphy case makes that point. And so when a court is addressing a close corporation, there's, for example, three, two shareholders, and they're conducting themselves similarly identical to a partnership, you would impose duties commensurate with the circumstances. But it's not a general rule that is this a close corporation? Is it publicly traded? Okay, now it's a partnership. And that just can't be the case. So I do not believe that those cases stand for that. Just to comment on the Murphy decision, to me it's clearly a misstatement. I mean, to say that the director owes to the stockholders, they're a trustee, there's a fiduciary, and it's just general by virtue of their status as directors in a corporation. If you look at the Reed decision, that is a situation where, yes, the defendant was a stockholder director and officer, but the factual circumstances are as he agreed with his shareholders, the fellow shareholders, to sell their stock for par value, no less than par value. And their agreement was, if you get more, we're going to split it equally commensurate with our proportionate to our shareholdings. And he didn't do that. He didn't disclose that prior to the time that he made the proposal, he had an interested buyer. And what he did was he sold the shares and pocketed the premiums for himself. I mean, that's classic breach of the duty of loyalty, breach of the duty, the court doesn't mention candor, but candor applies. I mean, that's just elementary principal agent duties. And so it's, you know, we have to look at what is the circumstance? You know, what are the circumstances here? It is an omission case, okay? What do these shareholders know? What duty are we going to impose on the directors? Everyone knows that we have to double the size of our capacity. That's going to require millions of dollars. We have to buy the building from Boyd. We have to pay for Boyd's shares. I mean, right there, that's 30 million. He acknowledges, he knows that 20 million is required for the expansion. So. Well, but just thinking about my, I'm going to grossly simplify, and you can please correct me, but Boyd sold his stock thinking that the company was worth 20 million. And within days, it turns out the company is worth 50 million, or at least that's what another party will put in to get half of the shares. Am I correct that I've sort of summarized the situation? You've summarized their position, yes.  So, so what's wrong, assuming that there was some preparation for the 50 million deal that happens very quickly thereafter. Why, why isn't this a material omission, at least under Michigan law, if not under federal securities law? Because as the district court said in his opinion, it didn't happen like that. There was no deal on the table. So it's a fact question, as opposed to a legal question, whether, if in fact, the things that they're asserting happened, there would be a material omission under Michigan law, and or a material omission under federal securities law. No, your honor, the June 2020 Idaho that Judge Davis brought up, that was a situation where he's arguing that the judge failed to draw reasonable inferences. Okay. We've quoted the testimony in our brief. And what I would argue is his position is granting reasonable inferences mean you ignore actual inferences. And as the question, and I mean, Dean Hahn testified, I outlined that we were searching for equity and debt financing to accommodate, you know, our financing needs. And if you read Boyd's testimony, he says, he initially says, he talked about debt financing. And then he was questioning, he said, well, you also talked about losing control. How did that, how did that come up? But what you're telling us now is your view of the facts is that there wasn't an omission. But what my question is, if there were an omission of, hypothetically, that Avista was engaging in negotiations with the remaining shareholders that would have been important to Boyd to know before Boyd sold his shares thinking the company was worth 20 million, when in fact these things were happening that resulted in a much higher valuation of the company. Would that, assuming their view of the facts is true, would that be a material omission under Michigan law or federal securities law? I believe they're complaint-led allegations that we would suggest proved untrue and the judge denied the motion to dismiss. So yes, even in the district court's mind. If there were negotiations going on, yeah, there's a question of fact. So the. But you're agreeing then, I may be just not understanding things. But I get the impression that you're agreeing with my statement of purported law that failing to tell Boyd, if that happens, failing to tell Boyd that negotiations were ongoing that would result in the value of the company doubling or tripling, that that would, I hear you, that would not constitute. You're saying now it would not constitute. Why wouldn't it be? If it were true, why wouldn't it be a violation of Michigan law? It depends where in the status, it's the probability of something happening. That's why I started inartfully to say, what do people know? We have an immense need for cash capital. How are we going about this? Equity. So my hypo, my hypo is Avista is talking to Hahn and saying, we're going to give you $50 million for half the stock. And that happens before Boyd knows anything about Avista being involved. And before Boyd sells his stock, thinking it's worth only $20 million as a company. So would that hypothetical omission, which I know you contest and say didn't happen, but if that were the omission, would that violate Michigan securities law? Well. Or Michigan closely held corporation law or whatever the Michigan law is. Well, let's take your hypothetical just one small step further that makes me more comfortable. You have to deal with my hypo. But there's ambiguity and I don't want to misstate it. But let's just say in the hypothetical before Boyd executed his release, they had a tentative deal inked. This is going to happen six months down the road. We're going to wait six months. Yeah, I think you've got a question of fact. Under any law. I'm trying to figure out what the law is applied to my hypo. But I don't want to monopolize. You can go ahead with your argument. So I would argue everyone, including Boyd, knows we need financing. Why? Expansion, buy the building, pay off Boyd. Because that was a process ongoing at the same time. Okay? We submit. No genuine issue. June, clear evidence. He knew equity was on the table. Knows it's on the table. So now then the question is, before Boyd executes his release and assignment of his shares, how did that circumstance, that pursuit of financing for an immense amount of money, change? What change that would make a reasonable investor or Boyd himself change his mind? And what they point out is the basis. I mean, the actual facts are critical. The basis for the immense valuation is Avista's internal memo. There's no evidence that Dean Hahn, in fact, he testified. I don't know. I don't remember that. I don't know what you're talking about. And the basis for that was he's the author of that internal Avista email is communicating to his co-investors his own assessment. So he's saying this is what, you know, and he testified that I came up with that because that is what Dean Hahn said we needed. We need 30 million. And is that the December 18th communication? Correct. That's an internal Altavista. It's internal and it's following a December 18th conversation. But it's reflecting communications he'd had with Hahn. It is. So why couldn't a reasonable jury infer from that email, even though it was dated December 18th, that these conversations happened before then, likely before December 17th? That would be speculation. There's absolutely no... But that's... But juries can't speculate. Well, I don't know that it's speculation. I mean, I think it's, he recognizes in the email that there has been some communication. And I don't think it's speculation to say it would have occurred before December 18th and probably not speculation to say it was before December 17th. This was immensely thorough discovery. There are phone logs. It's, the actual communications are documented in the party's briefs and in the record. There's no, there's no room. It's either a reasonable inference or it's not. And the author of the memo, he's been deposed, I assume? Yes. And that is discussed in our brief. It might be a long footnote, but to me it's, the conversation where they said, where Hahn said, I need 30 million, here's the proposal, could be able to do a 50% ownership. It's not a proposal. He says it's a straw man. I had to Google straw man to figure out what he meant. And it's just a, consider this, okay? That's his testimony. So there's no evidence of any interest other than what counsel highlighted. I don't think of this as interested in anybody smaller than 50 million. There's where you can legitimately say on the record, okay, is this something that I have to disclose at Vista? Because maybe they think this is worth 50 million. You have to understand, 50 million for what? The existing building? Or 50 million to buy the property that's currently being leased and to pay off for Boyd, for his shares, were 8 million, so, or 3 million. But didn't the evidence show that he didn't just say, they're only interested in 50 million? The next thing he said was, and I think we're there? No. I think we could be. My, this is, that's just what I tried to articulate is, is we could be there if we own the building. But we don't currently own it. I mean, it's, it's not just I'm buying it for your existing. It's like, we're going to put this capital in here. You're now going to own that building. You're now going to have paid off a shareholder. And you're going to double the size of your capacity. So yeah, it's a different enterprise. Your red light is on. Thank you. Thank you. Judge Moore, in response to your hypothetical, I suspect you'll have no surprise that we believe that the answer is yes, it's material. With regard to the question that was posed, I think, by brother counsel, what changed in the course of this, we believe the record reasonably interpreted suggests that what changed was a shift to equity financing. But even if the court were to say the district court was right on that point, and we disagree with the district court, the fact that Avista affirmatively reached out, they immediately came to the conclusion, it took them all of about, I think, nine minutes to come to the conclusion that the exact quote says nothing about the facilities, Judge Davis. It says that they fell in the mix of a $50 million company. It doesn't say we fall in the mix if they think we own the, if we think we own the property and we and all of the shareholders are participating, or any of these other caveats. It just says we fall in the mix, from which a jury could conclude that they understood that Avista's interest indicated a potential value of more than $50 million. Those two things changed, and Avista is someone who is a party here that now has an interest in minimizing what the reasonable interpretation of that December 18 email says, because they're now a 50% owner. But the email speaks for itself, Judge Bush. We think a jury reading that email could conclude that Avista had the conversation that Avista said it had with Mr. Hahn, saying implied valuation here of $60 to $70 million, days before the redemption transaction closed. In addition, so one additional fact to bring up here. The key player in the course of the Avista discussion is Dr. Rob DeWitt. He's the one who initiates the conversation. He is a known player to all of the parties here, because he is the person who handled the transaction for MPI and worked with Avista then. At the end of that December 4 board meeting, Dr. Boyd takes the other directors aside and says, you guys are having some management problems. You should really hire Dr. DeWitt to assist you. If they have partnership-like duties, and we believe that's what Michigan law says, because that's what it does say, that's the sort of information that has to be brought up. The simple fact is here that you can't treat a minority shareholder in a closely held business under Michigan law in the manner that was done here. The facts of Avista's interest in the pursuit of equity financing fundamentally changed the character of the business. They had a fiduciary duty to disclose that to Dr. Boyd. They failed to do so. We should be permitted to go to a jury on remand. Unless the court has further questions? Thank you. Thank you both. The case will be submitted and the clerk may call the next case.